IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs June 23, 2015

## STATE OF TENNESSEE v. SHANTA STINSON

**Appeal from the Circuit Court for Sullivan County**
**No. S61,768    R. Jerry Beck, Judge**

---

**No. E2014-02144-CCA-R3-CD – Filed August 14, 2015**

---

The Defendant, Shanta Stinson, pleaded guilty to aggravated burglary, a Class C felony, theft of property valued at $1000 or more but less than $10,000, a Class D felony, identity theft, a Class D felony, two counts of theft of property valued at more than $500 but less than $1000, Class E felonies, two counts of vandalism, Class A misdemeanors, and illegal possession of a credit card, a Class A misdemeanor. *See* T.C.A. §§ 39-14-403 (2014) (aggravated burglary), 39-14-103 (2014) (theft of property), 39-14-146 (2014) (theft of merchandise), 39-14-105 (2014) (grading of theft/vandalism), 39-14-150 (Supp. 2011) (amended 2013, 2014) (identity theft), 39-14-408 (2014) (vandalism), 39-14-118 (2014) (illegal possession of a credit card). The trial court sentenced the Defendant as a Range I, standard offender to concurrent terms of five years for aggravated burglary, three years for theft of property valued at $1000 or more, two years for identity theft, and two years for each theft of property valued at more than $500. The trial court also sentenced the Defendant to two concurrent terms of eleven months, twenty-nine days for each vandalism and illegal possession of a credit card conviction, for an effective five-year sentence. The court ordered the Defendant to serve eleven months, twenty-nine days at 75% service for the vandalism convictions and to serve her other sentences on probation. On appeal, the Defendant contends that the trial court erred by denying her request for alternative sentencing relative to her vandalism convictions and ordering her to serve the sentences in confinement.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which ALAN E. GLENN and TIMOTHY L. EASTER, JJ., joined.

J. Matthew King, Kingsport, Tennessee, for the appellant, Shanta Stinson.

Herbert H. Slatery III, Attorney General and Reporter; Benjamin A. Ball, Senior Counsel; Barry P. Staubus, District Attorney General; and Joseph E. Perrin, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

Pursuant to the negotiated plea agreement, the Defendant pleaded guilty to an effective sentence of five years with the trial court to determine the manner of service. At the guilty plea hearing, the State's recitation of facts showed that

[on July 5, 2012], Ms. Wagner [, the codefendant,] went to the funeral visitation of her grandfather, Mr. Robert Wagner. Accompanying her was Ms. Shanta Stinson, who she is in a relationship with. While at the visitation, words were exchanged between Ms. Wagner, Ms. Stinson, and family members of her grandfather, resulting in the two . . . leaving the funeral home.

Prior to leaving the funeral home, they cut the tires of an automobile that was owned by Amy Parker. The two then traveled to the grandfather's home, knowing that the other individuals in the family would still be at the funeral home. The two of them gained entry by damaging . . . the home of Robert and Cleta Wagner. They entered into the home and they took, first, property with a value of over $1,000 from Ms. Amy Parker, that being in part jewelry, a computer, money, and knives; property with a value of over $500 from Adele Arnold, a checkbook, cell phone, and credit cards; and property from the deceased grandfather, Robert Wagner, of jewelry and currency with a theft value of over $500.

They were observed by a neighbor leaving the home, and when the family returned to the home following the visitation funeral and finding that the home had been burglarized, . . . law enforcement was called.

Description was given by this neighbor of the two women . . . .

The case was assigned to Detective Randy Murray who located both of the defendants, and after advising both of . . . their constitutional rights . . . secured a written waiver of those rights, and both gave statements that mirrored one another in the sense . . . that they both admitted to the incident at the funeral home, entering into the grandfather's home without permission, and stealing the property that's listed in the presentment in this case.

The following day, . . . Ms. Adele Arnold received notification that one of the credit cards that was stolen from her in the burglary . . . had attempted to be used at a shopping center . . . at an ATM machine. Detective Murray was able to secure the video from the attempted use of this credit card and was able to identify Ms. Wagner and Ms. Stinson as the two individuals that attempted to use the credit card of Ms. Adele Arnold without her permission.

The Defendant stipulated to the facts as recited by the State.

At the sentencing hearing, the presentence report was received as an exhibit. The report reflects that the Defendant had previous convictions in Virginia for providing a false name to a police officer, driving while her license was suspended, price altering involving merchandise valued at less than $200, two counts of credit card fraud, obtaining goods by use of a credit card without permission, and "withheld credit card." The Defendant graduated from high school in 1989 and obtained degrees in psychology and sociology in 1993. She reported fair physical health. She suffered from fibromyalgia, arthritis, knee and back pain, bone spurs, lumbar vertebrae pain, carpal tunnel syndrome, asthma, thyroid disease, hypertension, anxiety, and depression. The Defendant reported taking various medications.

The presentence report shows that the Defendant had good mental health but noted she received treatment for situational depression and anxiety and for panic attacks. She reported consuming alcohol at age twenty-one but denied drinking excessively or frequently. She denied using illegal drugs and abusing her prescription medications. The Defendant lived with her mother in Virginia and had a good romantic relationship with her codefendant since October 2009. She reported employment at her church caring for the elderly since May 2013 and reported previous employment at Health South as a case manager from January 2010 to April 2012, when she was laid off. The Defendant also reported previous employment at Preferred Alternative and Wexford House between February 2004 and October 2010.

Amy Parker submitted a victim impact statement requesting the Defendant serve her five-year sentence in confinement. She stated that as a result of the Defendant's conduct, she suffered from distress, fatigue, sadness, fear, and sleeplessness.

The Defendant submitted three letters from members of the community. In the first letter, the Defendant's pastor stated that the Defendant had been a regular church attendee for more than six months, that she had conducted herself appropriately, and that she was a "learner" who had favorable relationships with the people around her. The pastor reported that the Defendant had received "glowing reports" relative to her caregiving responsibilities to the church's elderly members. In the second letter, Linda Allen and Roger Howard

-3-

expressed their appreciation for the Defendant's caring for their father from June until September 2014 and stated that the Defendant was an "outstanding caregiver/person." In the third letter, Mary Lou Stinson, the Defendant's mother, stated that the Defendant lived with her and provided care due to Ms. Stinson's failing health. She reviewed her extensive medical conditions. Ms. Stinson discussed the Defendant's desire to help others and noted the Defendant had been a social worker for twenty years. She requested the trial court consider these factors during sentencing.

The Defendant testified that she intended to continue living with her mother if she received probation. She discussed her education and said she had maintained continuous employment since 2004, except for twelve months when she was recovering from shingles. She said that she contracted her social work services to various places in the community and that she had four or five clients. Relative to the driving while her license was suspended conviction, she said she her driving privileges had been restored. She said that before her arrest in the present case, she had not had any legal problems for about ten years. She successfully completed her probation in the price altering case and noted she received early release from probation. Relative to her previous theft- and credit card-related convictions, she said that the offenses occurred in 1994, that she pleaded guilty to misdemeanors, and that she received probation.

The Defendant testified that she was diagnosed years previously with fibromyalgia and arthritis in her left knee because of a softball injury. She suffered from bone spurs and an anxiety-panic-attack disorder and said she suffered from nerve-ending pain as a result of contracting shingles. She had been prescribed Xanax for anxiety for seven or eight years and Norco for the pain associated with arthritis and fibromyalgia for three years. She denied abusing prescription medications, identified her treating physician, and said she was drug tested regularly to ensure she took her medications as prescribed.

The Defendant testified that although her codefendant stated that they "drove around town trying to get drugs wherever [they] could," she said it was possible her codefendant did that when she was not present. She denied buying or attempting to buy drugs. She admitted her codefendant had a significant substance abuse problem. She denied having a substance abuse problem and noted she had no previous drug-related convictions.

The Defendant testified relative to the present offenses that she and her codefendant went to the funeral home, that her codefendant spoke to her codefendant's father, and that her codefendant "felt the cold shoulder" from her codefendant's family. The Defendant said she had witnessed similar treatment of her codefendant for years. She said that witnessing her codefendant's family's treatment was painful and that she reacted without thinking. The Defendant admitted she was angry and said she took responsibility for her conduct. She said

-4-

that she could not describe the humiliation and shame she felt for her conduct and that the victims did not deserve what she did to them. She apologized to the victims and was willing to pay restitution.

The Defendant testified that she cooperated with the police and did the best she could to help recover the stolen items. She said that since her arrest, she ended her relationship with her codefendant and changed her life completely. She had married since the end of her relationship with her codefendant, and the couple lived in Virginia "as a partnership."

On cross-examination, the Defendant testified that her codefendant took money from her codefendant's deceased grandfather's wallet and that she did not recall who took the jewelry. She agreed she did not interact much with her codefendant's family. She said her codefendant's father was upset that they arrived late and in their "condition." She said her codefendant attempted to obtain money from the stolen credit card at the ATM, but she admitted she was present when the attempts were made. She said that she and her codefendant were discharged from a doctor's office but said "there was a reason for that."

On redirect examination, the Defendant testified that although she had previously received probation twice, she successfully completed probation. She said she received probation ten and twenty years earlier.

The trial court found that the cutting of the tires at the funeral home was the Defendant's and the codefendant's "setting up to . . . do the burglary because . . . the cutting of the tires occurred before the burglary[.]" The court stated, "[C]ertainly that was the high point, I guess, of the cruelty that was involved, the premeditation . . . involved." The court noted the crimes were atrocious and cruel and said that it could consider the nature of the crime in extreme circumstances. Based on the Defendant's prior record and the nature of the offense, the court found that the vandalism could not "go unpunished." The court ordered the Defendant to serve eleven months, twenty-nine days at 75% service in the county jail. Relative to the remaining convictions, the court ordered five years' probation. This appeal followed.

The Defendant contends that the trial court erred by ordering her to serve the vandalism sentences in confinement. She argues that the court's denying probation or alternative sentencing "was contrary to misdemeanor sentencing law and violated fundamental sentencing purposes and principles." The State responds that the trial court did not abuse its discretion. We agree with the State.

This court reviews challenges to the manner of service within an appropriate sentence range "under an abuse of discretion standard with a 'presumption of reasonableness.'" *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012). A trial court must consider any evidence

received at the trial and sentencing hearing, the presentence report, the principles of sentencing, counsel's arguments as to sentencing alternatives, the nature and characteristics of the criminal conduct, any mitigating or statutory enhancement factors, statistical information provided by the Administrative Office of the Courts as to sentencing practices for similar offenses in Tennessee, any statement that the defendant made on his own behalf, and the potential for rehabilitation or treatment. *State v. Ashby*, 823 S.W.2d 166, 168 (Tenn. 1991); *see* T.C.A. §§ 40-35-103 (2014), -210 (2014); *State v. Moss*, 727 S.W.2d 229, 236 (Tenn. 1986); *State v. Taylor*, 744 S.W.2d 919 (Tenn. Crim. App. 1987)); *see also* T.C.A. § 40-35-102 (2014).

The standard of review for questions related to probation or any other alternative sentence is an abuse of discretion with a presumption of reasonableness. *State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012). Generally, probation is available to a defendant sentenced to ten years or less. T.C.A. § 40-35-303(a). The burden of establishing suitability for probation rests with a defendant, who must demonstrate that probation will "'subserve the ends of justice and the best interest of both the public and the defendant.'" *State v. Souder*, 105 S.W.3d 602, 607 (Tenn. Crim. App. 2002) (quoting *State v. Dykes*, 803 S.W.2d 250, 259 (Tenn. Crim. App. 1990)); *see* T.C.A. § 40-35-303(b); *State v. Carter*, 254 S.W.3d 335, 347 (Tenn. 2008).

A sentence is based upon "the nature of the offense and the totality of the circumstances," including a defendant's background. *Ashby*, 823 S.W.2d at 168); *see State v. Trotter*, 201 S.W.3d 651, 653 (Tenn. 2006). A trial court is permitted to sentence a defendant to incarceration when:

(A) [c]onfinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

(B) [c]onfinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) [m]easures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant[.]

T.C.A. § 40-35-103(1)(A)-(C); *see Trotter*, 201 S.W.3d at 654.

Although our supreme court has not considered whether the abuse of discretion with a presumption of reasonableness standard applies to misdemeanor sentencing determinations, it has stated that the standard "applies to all sentencing decisions," and this court has previously

applied the standard to misdemeanor sentencing. *State v. King*, 432 S.W.3d 316, 324 (Tenn. 2014); *see State v. Sue Ann Christopher*, No. E2012-01090-CCA-R3-CD, 2013 WL 1088341, at *6-8 (Tenn. Crim. App. Mar. 14, 2013), *perm. app. denied* (Tenn. June 18, 2013); *State v. Christopher Dewayne Henson*, No. M2013-01285-CCA-R3-CD, 2015 WL 3473468, at *5-6 (Tenn. Crim. App. June 2, 2015); *see also* T.C.A. § 40-35-401(d) (2014) (stating all sentencing questions pursuant to Code section 40-35-401(a) are subject to the same standard of review).

Although a trial court is not required to hold a sentencing hearing, a court must permit the parties to address, in relevant part, the manner of service. T.C.A. § 40-35-302(a) (2014). Trial courts are granted considerable discretion and flexibility in misdemeanor sentencing determinations. *State v. Troutman*, 979 S.W.2d 271, 273 (Tenn. 1998); *see State v. Combs*, 945 S.W.2d 770, 773-74 (Tenn. Crim. App. 1996). Although trial courts are required to state findings of fact relative to imposing sentences for felony convictions, courts are not required to do the same in imposing sentences for misdemeanor convictions. *Troutman*, 979 S.W.2d at 274. In determining the manner of service, a trial court must consider the purposes and principles of sentencing and the enhancement and mitigating factors and must not impose arbitrary incarceration. T.C.A. § 40-35-302(d); *see Troutman*, 979 S.W.2d at 274 (stating that "while the better practice is to make findings on the record when fixing a percentage of a . . . sentence to be served in incarceration, a . . . court need only consider the principles of sentencing and enhancement and mitigating factors . . . to comply with the legislative mandates of the misdemeanor sentencing statute").

The record reflects that the trial court considered the appropriate purposes and principles of sentencing in ordering the Defendant to serve eleven months, twenty-nine days at 75% service for the vandalism convictions. Although the Defendant's previous convictions occurred years before the present offenses, we note the similarity in the types of offenses involved. Likewise, the record reflects that the Defendant had twice received probation but continued to engage in criminal conduct. Although the Defendant argues in her brief numerous mitigating factors apply, the evidence was before the court, and it found the enhancement factors more compelling than the mitigating factors. We note the court was not required to place its findings on the record relative to enhancement and mitigating factors. The Defendant admitted cutting Ms. Parker's tires at a funeral home while the family was mourning the loss of her codefendant's grandfather. Upon cutting the tires, the Defendant and her codefendant drove to the deceased's home, entered without permission, and took multiple items, some of which were never recovered. The day following the vandalism and burglary, the Defendant and her codefendant attempted to obtain money from the credit cards they took from the deceased's home. We note that the Defendant's explanation for her conduct was her anger regarding the treatment her codefendant received from her codefendant's family. The court's consideration of the nature of the offense was

not improper, and we conclude that the court did not abuse its discretion by denying the Defendant probation relative to the vandalism convictions.  The Defendant is not entitled to relief.

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
ROBERT H. MONTGOMERY, JR., JUDGE